IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DAVID J. SOWERS,

    Plaintiff,

v.                           Civil Action No. 3:06cv754

POWHATAN COUNTY, VIRGINIA,
et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the Motion for Summary Judgment (Docket No. 36) and Motion to Dismiss Amended Complaint Pursuant to Rule 12(b)(6) ("Mot. to Dismiss") (Docket No. 23) filed by the Defendant, Powhatan County.[1] The Amended Complaint presents three counts under 42 U.S.C. § 1983. Count One asserts a claim for violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. Counts Two and Three assert claims for deprivation of substantive due process, an offense against the Due Process Clause of the Fifth Amendment to the United States Constitution. For the reasons set forth below, the Motion for Summary Judgment will be granted

---

[1] The Amended Complaint names, as defendants, both Powhatan County and the Board of Supervisors. Thus, in practical effect, there is only one defendant, the County.

as to all three counts, and the Motion to Dismiss will be denied as moot.

**BACKGROUND**

This action arises from a dispute over a series of governmental actions taken in relation to a 250.9 acre tract of land owned by David Sowers in Powhatan County. The first set of actions involves an application submitted by Sowers to amend the zoning classification of the tract from A-1 (Agricultural) to R-5 (Residential). The second set of actions involves a number of approvals sought by Sowers as part of his plan to develop that tract. Counts One and Two stem from the County's allegedly unconstitutional actions in initially denying the rezoning application. Count Three is based on the County's allegedly arbitrary actions in delaying the approval of certain permits sought by Sowers in relation to the development that was the subject of the rezoning application.

**A.    The Rezoning Application**

The facts surrounding Sowers' application for rezoning are generally not in dispute. They are set forth below.

**1.    Initial Process**

Sowers submitted an application to amend the zoning classification of the 250.9 acres tract at issue on June 29, 2004. As part of the application, Sowers remitted a fee of $15,610.00, of which $2,070.00 was later refunded by the County

2

due to overpayment.  Along with the rezoning application, Sowers also tendered a cash proffer[2] of $3,530 per lot, the minimum suggested cash proffer amount at the time.  In July 2004, a few weeks after Sowers submitted the rezoning application, the minimum suggested cash proffer amount was raised to $6,395 per lot.

Pursuant to state and local law, the rezoning application had to be reviewed by the local Planning Commission before it was presented for determination by the local governing body, the Board of Supervisors ("Board").  As part of the process, the Planning Commission held a public hearing and prepared a recommendation and report to the Board.  The process also entailed meetings by Sowers or his representative with the Planning Commission before it held the public hearing.

Sowers' application first came before the Planning Commission in September 2004.  Just before that meeting, Sowers arranged a meeting with residents in the vicinity of the proposed development.  Based on the feedback he received at that meeting, Sowers developed revised non-cash proffers and a modified conceptual plan.  He then requested, and received, a deferral of the hearing on the application until October 2004.

---

[2]  A "cash proffer" is cash tendered as a part of an application that is intended to defray the costs of capital facilities related to new development.  See Bd. of Supervisors v. Reed's Landing Corp., 250 Va. 397, 399 (Va. 1995).

In private meetings with members of the Planning Commission, Sowers was asked whether he would be willing to increase the cash proffer.  A like suggestion was made from the public that he do so.  Sowers never increased the amount of the cash proffer.

The Planning Commission scheduled a public hearing on the application for October 5, 2004.  Sowers submitted amended proffers, with no change to the cash proffer, to the Planning Commission the afternoon of the meeting.  The Planning Commission took these amended non-cash proffers into consideration, passing a motion to waive the rule that required proffers to be submitted not less than seven business days before the public hearing on an application.

Citizens expressed many concerns about the proposed development in letters and also at the meeting of the Planning Commission.  The Virginia Department of Transportation ("VDOT") also expressed concerns and made some recommendations.  The principal concerns expressed by the public and VDOT during this process were: increased traffic volume; safety related to increased traffic volume; higher tax burden; loss of the rural character of the area from over-development; and insufficient access to the development which would precipitate traffic problems other than those related solely to traffic volume.

4

After receiving these views and expressions of concern, the Planning Commission offered Sowers the opportunity to have the application deferred so that he could assuage some of the concerns expressed by citizens and by VDOT.  Sowers declined, wanting his application to be sent directly to the Board.  The record reflects that this was an unusual stance for an applicant to take.  Pursuant to Sowers' wishes, the Planning Commission voted on the application, allowing it to be sent to the Board.  With unaddressed concerns before it, the Planning Commission voted to recommend that the Board deny Sowers' application for rezoning.

## 2. Denial by the Board of Supervisors

Sowers delivered new non-cash proffers to the County Planning Director for comments on November 10, 2004.  The Planning Director did not review the revised proffers prior to the next Board meeting on November 17, 2004.  The revised proffers were considered officially submitted to the Board on November 17, 2004, the day of the meeting at which the application came before the Board.

One of the Supervisors, Russell E. Holland, found it necessary to recuse himself from voting on the Sowers application.  Holland was elected to the Board in November 2003, running on a platform based in large part on limiting growth in the County.  Holland owned 56 acres of the tract for which

Sowers sought rezoning.  Although Holland had contracted to sell the land to Sowers, he was not involved with the development of the tract.  For reasons not appearing in this record, the application for rezoning listed Holland as a joint applicant with Sowers.[3]   Therefore, Holland recused himself from deliberations regarding this rezoning application.

The Zoning Ordinance requires that new or amended proffers be filed 10 days before the public hearing at which the Board is to consider a zoning issue involving those proffers.  Sowers' proffers were submitted after that official pre-filing deadline. The Board voted to reject Sowers' request for a waiver from the pre-filing deadline and thus did not consider the proffers.  The parties agree that there are no other known instances when late proffers were not considered by the Board.

The Board also voted to deny the application, refusing Sowers the opportunity to defer consideration of his application

---

[3] Sowers alleges that the listing of Holland on his application was differential treatment intended to prejudice his application.  Resolution of this issue is not relevant to the Court's ruling on the motions.  It suffices to note that Holland's undisputed ownership of part of the land and his platform of no growth could well have inspired a prudential decision to include his name on the application lest angered citizens accuse the County or developer of being less than forthright were it omitted then discovered to be omitted.  For purposes of deciding the instant motions, the Court considers only that Holland recused himself, not the wisdom or necessity of that decision.

to the next Board meeting or to have the application remanded to the Planning Commission.

Supervisor Cosby precipitated the vote by stating:

> Well, it's been to the Planning
> Commission once with refusal of the
> applicant to work with them, so they
> recommended a denial to us, and my motion
> is that it be denied at this level.

(Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mot.") Ex. 1, Tab G at 47.) The minutes of the meeting describe this call to vote as follows: "Mr. Cosby moved to deny 04-11-REZ-C as the applicant refused to work with staff and the Planning Commission." (Id. at Ex. 1, Tab F at 13.)

### 3. Board Rationale for Denial

In briefing the pending motions, the County identified several reasons why the Board rationally could have denied Sowers' application, notwithstanding that it had approved somewhat comparable applications filed by others. Among those conceptual reasons were the specific road configuration of Sowers' proposed development with its unique traffic consequences; more strenuous and better organized opposition to Sowers' application than to other applications; and the problem of voter disenfranchisement occasioned by the recusal of Holland, the Supervisor from the district in which the tract at issue was located.

7

None of those reasons were articulated by the Board when it voted down the application submitted by Sowers. Nonetheless, the record contains evidence tending to support them.

For example, the record demonstrates that there was significant citizen opposition to Sowers' proposed development. Almost a dozen citizens spoke at the meeting and many more wrote letters opposing the development. (Def.'s Mot. Ex. 1, Tabs C and D.) There were a number of complaints about the potential traffic problems created by a development of this size, including general traffic congestion as well as traffic safety. Many writers and speakers presented opposition based upon the urbanization of this rural area and based upon the apprehended adverse affects on the quality of life in the community.

Citizens also voiced strenuous objection to Holland's association with the development decrying what they perceived as Holland's hypocrisy in enabling such a large development, notwithstanding that he had run for election on a limited growth platform. They complained that Holland's recusal left them unrepresented and pleaded with the other supervisors to effectively represent the citizens in Holland's district where the development was to be built. For instance, some letters complained:

> We are now stuck with a DEVELOPER for votes
> that do not singularly affect the CITIZENS
> of District 1 and a seat warming, deaf-mute

> for votes that do affect the CITIZENS of
> District 1.  Mr. Holland and the District 1
> seat are deaf-mute because not only do his
> development interests diametrically oppose
> the CITIZENS wishes (thus our pleas fall on
> deaf ears) but he does not have to look the
> CITIZENS of District 1 in the eye and vote
> counter to their wishes because he must
> abstain (thus he will be mute).

(Def.'s Mot. Ex. 1, Tab C.)

During oral argument, counsel for the County conceded that, with regard to Supervisor Cosby's comment in moving to reject the application (that Sowers had refused to work with the Planning Commission), the only two areas in which Sowers had not worked with the Planning Commission were: (a) the refusal to up his cash proffer; and (b) the VDOT concerns, which concerns were addressed in the late proffers.

However, in supplemental briefing, counsel attempted to withdraw that admission, arguing that the record showed that Sowers' refusal to continue working with the Planning Commission involved matters other than the so-called VDOT concerns and the amount of the cash proffer.  The record demonstrates that the Planning Commission was confronted with many citizen complaints about Sowers' application, beyond VDOT's recommendations or the amount of the cash proffer.  The Planning Commission's Report deriving from the October 2004 meeting identifies Sowers' failure to address several rezoning criteria recommended by the Comprehensive Plan as well as failure to address traffic impact

and safety concerns of VDOT as rationale recommending denial of Sowers' application. (Def.'s Mot. Ex. 1, Tab A at 9.)

### 4. Eventual Approval

Shortly after the Board rejected the application, Sowers filed a state court action seeking to overturn the actions of the Board and the County. At an April 25, 2005 hearing in the state litigation, the County Attorney announced that the County would allow Sowers to re-file his rezoning application without payment of another filing fee and without awaiting the passage of 12 months, as would otherwise be the waiting period after a denial of a rezoning application. Sowers declined that offer, but, on January 9, 2006, the Board voted to reconsider Sowers' rezoning application. In February 2006, the Board voted to remand the application to the Planning Commission. The Planning Commission recommended approval by the Board in April 2006 and the Board approved Sowers' application on May 8, 2006. Thereafter, the state court action was non-suited upon motion by Sowers.

### B. Delay of Approvals Related to the Development

Sowers also alleges that the County unreasonably delayed granting ministerial approvals for at least three applications: (1) an address for his new residence on land adjacent to the new subdivision that was part of the rezoning application; (2) an erosion and sediment control plan with accompanying application

10

for a County land disturbance permit which was a precondition to obtaining approval of a subdivision plat for the new subdivision; and (3) the preliminary subdivision plat itself. These delays are the basis for the substantive due process violations alleged in Count Three.

### 1. Address for Sowers' New Residence

In the fall of 2004, Sowers applied for a county street address for a new family residence that he sought to construct on a portion of the land acquired from Holland. This land was thus adjacent to, but not part of, the new subdivision for which he had applied for rezoning. Sowers was informed that, because there was another house on the same parcel, he would be unable to obtain a street address for a second house on that parcel or lot. To eliminate that obstacle, in October 2004, Sowers obtained approval for and recorded a plat for a single-cut subdivision that would place the new home and existing home on separate lots. Sowers then had a series of disagreements with the County about whether he would need to construct a new road to obtain legal access to, and an address for, his new residence.

As a result, it was not until March 17, 2006 that the Director of Planning and Community Development told Sowers that he would be assigned an address on Norwood Creek Road -- Sowers' preferred address that would not require him to construct a new

road. However, the Director specified that this did not constitute approval of Sowers' access easement. The Amended Complaint alleges that, "[d]espite compliance with every requirement for obtaining final approval of an unconditioned and unconditional access and address for his new family residence by way of Norwood Creek Drive," Sowers had not yet received such approval when the Amended Complaint was filed on July 30, 2007. (Am. Compl. ¶ 131.)

### 2. Erosion and Sediment Control Plan

Sowers submitted an application for a land disturbance permit and related erosion and sediment control plan on May 30, 2005. These applications related to construction of a road to secondary road specifications on land in the original subdivision, which approval was a precondition of approval of a subdivision plat for the new subdivision on land involved in the aforementioned rezoning dispute. At the instruction of the County Attorney, the Planning Department put a temporary hold on the plans submitted by Sowers. On March 13, 2006, over nine months after Sowers' initial submission, he received comments from the relevant government bodies, VDOT and Monacan Soil and Water Conservation District ("MSWCD") with required revisions. Sowers submitted revised plans on June 21, 2006 to the Planning Department. The revised erosion and sediment control plan was not forwarded to MSWCD until September 11, 2006.

12

### 3. Preliminary Subdivision Plat

In order to obtain approval of a subdivision plan for a new subdivision on the rezoned land, Sowers was required to obtain approval for his site plan for Norwood Creek Road Extended. Sowers submitted his site plan for the road in April 2006. He submitted a preliminary subdivision plat for the new subdivision in March 2007. Sowers complains that the completion of this preliminary subdivision plat was delayed beyond the date of the rezoning approval in May 2006 due to the County's delay in approving his site plan for the extended road. Sowers was notified on July 23, 2007 that his preliminary subdivision plat had been approved.

Against the foregoing factual background, as to which there is no material dispute of fact, the County's motions will be considered.

### C. The Amended Complaint

Sowers alleges three counts in his Amended Complaint.

Count One is a claim of equal protection violation for the County's treatment of the rezoning application. The count is somewhat difficult to fathom because it expresses complaints about the County's conduct often without linking the complaints to the denial of a federal constitutional right or to any specified damage. However, according a reasonable interpretation to Count One, it appears to advance two, somewhat

13

related, equal protection theories predicated on the County's disparate treatment of Sowers' rezoning application.

First, Count One alleges three instances of disparate treatment in the County's conduct just before denying the rezoning application: (1) the refusal of the Board to waive the pre-filing deadline for the amended proffers; (2) the refusal of the Board to remand the matter to the Planning Commission; and (3) the refusal of the Board to defer the matter to the next Board meeting. Second, Sowers alleges that the Board's denial of his application for the reasons stated on the record on the motion made by Cosby was a denial of his equal protection rights because no application, before or since, has been denied for that reason.

Count Two presents an alleged substantive due process violation for the time value of Sowers' application fee, based on the County's denial of the rezoning application for the purportedly arbitrary reason that Sowers had refused to work with the Planning Commission, which allegedly was a new policy as to which Sowers was given no advance notice.

Count Three is another substantive due process claim based on Sowers' asserted property interest in the residence address and road access approval, the site plan and land disturbance permit approval for Norwood Creek Road Extended, and the preliminary plat approval for the new subdivision developed on

14

land subject to his 2004 rezoning application. Sowers claims that the County's delay in granting the ministerial approvals for these three applications violated his due process rights.

## B. Procedural Background

### 1. The Motion to Dismiss

The County has moved to dismiss Count One in part and Counts Two and Three in whole under Fed. R. Civ. P. 12(b)(6).

The County seeks dismissal of the constituent components of Count One, but does not seek to dismiss Count One based on the denial of the rezoning application. The County argues that the prefatory refusals - to waive the deadline for new proffers, to remand, or to defer Sowers' application - have no independent substance apart from the denial of the rezoning application.

Then, on Count Two, the County makes four arguments in favor of dismissal. First, the County argues that Sowers had no property interest in the rezoning, much less the time value of the application fee. Second, the County argues that there was no deprivation because the rezoning application was ultimately approved. Third, the County argues that delay of the application from November 2004 to May 2006 was not egregious enough to meet the stringent requirements for a substantive due process claim. Fourth, the County argues that there were adequate post-deprivation remedies available to Sowers, thereby foreclosing a substantive due process claim.

15

Finally, as to Count Three, the County seeks dismissal principally on the theory that the relevant actors were not policy-makers for the County, and therefore their actions cannot be the basis for liability under § 1983.

## 2. The Motion for Summary Judgment

The County also has filed a Motion for Summary Judgment.

On Count One, the County argues that Sowers was not similarly situated to any other applicant and that there was a rational basis to deny his claims and that no reasonable jury could find otherwise.

As to Count Two, the County resubmits the arguments made in its Motion to Dismiss, arguing that: (1) Sowers had no property interest in the time value of his application fee; (2) there was no deprivation; (3) there were adequate post-deprivation remedies for the denial of rezoning; and (4) there was no conscience-shocking conduct. On Count Three, the County also relies on those arguments and reasserts the argument made in the motion to dismiss that there was no policymaker involvement in occasioning the alleged delays.

Given that discovery has been concluded, it is preferable to address the issues in context of the motion for summary judgment.

## DISCUSSION

### A.   The Standard of Review for Summary Judgment

"Summary judgment is proper only if no material facts are in dispute." Jakubiak v. Perry, 101 F.3d 23, 26 (4th Cir. 1996). See also Fed. R. Civ. P. 56.   In determining whether facts are in dispute, the evidence of the non-moving party is to be believed, and all justifiable inferences must be drawn in his favor.    Id.  However, once the defendant makes a properly supported motion for summary judgment, the burden is on the plaintiff to set forth specific facts showing that there is a genuine issue for trial.   Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 817 (4th Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   In the end, the non-moving party must do more than present a "scintilla" of evidence in its favor. Id. at 818.   He must present sufficient evidence such that a reasonable juror could find for him.   Id. "[I]n a case where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is proper." Estate of Kimmell v. Seven Up Bottling Co., 993 F.2d 410, 412 (4th Cir. 1993) (internal quotations and citations omitted). Thus, if the evidence is "merely colorable" or "not significantly probative," a motion for summary judgment may be granted.   Sylvia, 48 F.3d at 818.

17

## B. Count One: Equal Protection

To recover on a claim filed pursuant to 42 U.S.C. § 1983, a plaintiff must allege and prove that he or she was (1) deprived of a federal right, privilege, or immunity (2) by any person acting under color of state law. Gomez v. Toledo, 446 U.S. 635, 638 (1980) (citing 42 U.S.C. § 1983). Of course, § 1983 is simply a procedural vehicle for seeking redress for a violation of a right conferred by the United States Constitution or by a federal statute. In Count One, Sowers asserts that his rights under the equal protection clause of the Fourteenth Amendment were violated.

The Supreme Court has deemed cognizable equal protection claims asserting a "class of one." See Village of Willowbrook v. Olech, 528 U.S. 562, 564-65 (2000). To prevail on such a claim, the plaintiff must establish that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. Id. at 564; In re Premier Automatic Servs., Inc., 492 F.3d 274, 283 (4th Cir. 2007) (citing Olech).

Some classifications, such as those based on race and gender, are deemed inherently suspect and are subject to varying degrees of heightened scrutiny. Plyler v. Doe, 457 U.S. 202, 216 & n. 14 (1982). However, "the vast majority of governmental action," especially that regarding subjects of a state's plenary

18

police power, such as local economics and social welfare, "enjoys a strong presumption of validity and must be sustained against a constitutional challenge so long as it bears a rational relation to some legitimate end." <u>Van Der Linde Housing, Inc. v. Rivanna Solid Waste Authority</u>, 507 F.3d 290, 293 (4th Cir. 2007) (internal citations and quotations omitted). Therefore, "[i]t is emphatically not the function of the judiciary to sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." <u>Id.</u> (internal citations and quotations omitted).

In asserting a claim for the denial of equal protection of law, it is the plaintiff's burden to demonstrate the lack of a rational basis for the asserted state action. "The burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>Board of Trustees of University of Alabama v. Garrett</u>, 531 U.S. 356, 367 (2001) (internal quotation marks omitted); <u>see also</u> <u>Van Der Linde</u>, 507 F.3d at 293. The relevant inquiry is "whether local officials reasonably could have believed that their action was rationally related to a legitimate governmental interest." <u>Tri-County Paving, Inc. v. Ashe County</u>, 281 F.3d 430, 439 (4th Cir. 2002); <u>Front Royal and Warren County Indus. Park Corp. v. Front Royal</u>, 135 F.3d 275,

290 (4th Cir. 1998).   The actual motivation for the County's actions is constitutionally irrelevant.   Id.

Although the Olech test can be considered as consisting of two different components (is the plaintiff similarly situated and is there a rational basis for the challenged action), the "similarly situated" and the "rational basis" inquiries are often tightly interconnected, and they certainly are here. Nonetheless, it is useful to assess each component separately.

### 1.   Similarly Situated

In assessing whether there are any similarly situated applicants to the plaintiff, the Court's task is to determine whether there are differences between applicants that could justify the differences in treatment.   See United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996).   The plaintiff must be similarly situated to other applicants in key respects, otherwise the Court has no basis of comparison when determining whether the plaintiff has been treated unconstitutionally. Sowers has not met his burden of setting forth specific facts to show that there is a genuine issue for trial on the issue of similarly situated applicants.   See Sylvia, 48 F.3d at 817.

### a.   The Comparators to the Application Filed by Sowers

Sowers has identified four other applications as similarly situated comparators to be used in assessing his claim: the

McClure application (04-09-REZC, 05-08-REZC), the DuVal rezoning application (04-19-REZC),[4] the Gray rezoning application (06-04-REZC), and the County's first rezoning application in April 2000.

Rather than present specific comparative cases, Sowers relies most strongly upon the blanket statement that no other residential rezoning applicant has ever been refused the opportunity to have additional, late proffers accepted, or has been denied the opportunity to have the vote on the case deferred or has been denied a request to have the case re-referred to the Planning Commission. In the absence of analysis of specific comparisons to specific alternatives, Sowers, in essence, asks the Court to rely upon an inference that out of all these other applicants for rezoning, at least one must have been similarly situated.

Without a more specific showing of similar circumstances -- the same kind of traffic, urbanization, environmental impact, citizen opposition, and voter disenfranchisement concerns -- the generalized claim of differential treatment is not enough to

---

[4] The Declaration of David J. Sowers identifies the DuVal application as 04-10-REZC. (Pl.'s Mot. in Opp. to Summ. J. Ex. A at 10.) ("Pl.'s Mot.")  However, 04-10-REZC appears to be an application for rezoning by R. F. Ranson.  The DuVal Development was 04-19-REZC.  (Id. at Ex. H, Tab 20.)  From the descriptions of the developments, the DuVal application (04-19-REZC) appears to be what Sowers intended to reference, rather than the Ranson application (04-10-REZC), which implicates very different concerns than the Sowers application.

sustain a claim of equal protection violations.  See Tri County Paving, Inc. v. Ashe County, 281 F.3d 430, 440 (4th Cir. 2002) (finding that the plaintiff had failed to meet its burden of demonstrating that the County treated it differently from any similarly situated entity where all it had shown was that "other businesses in Ashe County were granted building permits while its application was denied, and that a 30-year old asphalt plant continued to operate in the County.").

Moreover, the record rather clearly establishes that each of the applications referenced by Sowers can be distinguished in key respects from the application filed by Sowers.  Each will be assessed in turn.

The County has identified several ways in which the McClure application is distinguishable from that of Sowers.  First, McClure's development involved a different road configuration with traffic consequences quite different from those presented by the application filed by Sowers.  Second, the opposition to Sowers' application was more strenuous and better organized. Third, McClure's application did not require a supervisor to recuse himself from voting, raising concerns about voter disenfranchisement.  Those assertedly distinguishing factors are supported by the record.

From a review of the record, it appears that, as the County contends, the DuVal rezoning application also was different from

22

that submitted by Sowers in some important respects.  The DuVal application did not include late proffers and seemed to involve quite different traffic considerations.  Significant in the decision to pass the DuVal application appeared to be a perception that approval of the rezoning request was necessary to mitigate an unsafe pre-existing traffic configuration. Although citizens raised concerns about the traffic implications of the rezoning, there was an important counterbalancing concern.  A supervisor called it a "choice of two evils." Finally, the DuVal application did not require a supervisor to recuse himself.

The Gray rezoning application appears to be the closest to the application filed by Sowers in terms of intensity of citizen opposition and similarity of traffic concerns, but the development was planned with over 200 proposed acres (out of 538.03) preserved with open space.  Thus, the Gray application did not present the same urbanization issues as did the Sowers application.  Nor did the Gray rezoning involve the recusal of a supervisor.

As for the April 2000 case, it too appears to have been comparable to the Sowers application in terms of strength of citizen opposition, but the traffic and population density of the County was much different at that earlier time period. Furthermore, Holland was not elected until 2003, so a 2000

23

rezoning could not have implicated the unique concerns associated with his specific candidacy and need to recuse himself.[5]

### b. Sowers' Decision To Bypass Further Cooperation With The Planning Commission Was Unusual

In addition, Sowers was not similarly situated to any other applicant because he was unique in that he admittedly was not willing to work with the Planning Commission in the period just before the Board denied the rezoning application. In his deposition, Planning Director Brandon Stidham stated that Sowers took a "very unusual stance" in not wanting to work further with the Planning Commission and wanting it to be moved to the Board of Supervisors level. (Def.'s Mot. Ex. G at 138). In his Affidavit, Mr. Stidham stated: "I found it surprising that

---

[5] Sowers also argues that the fact that the Board approved his application in May 2006 after the state court lawsuit is proof that it had no rational basis for denying his application in 2004. That argument is superficially appealing, but it does not carry the day. Even assuming that there was no passage of time with concomitant change of conditions in the County, the 2006 approval of Sowers' application was given only after the Planning Commission had undertaken a thorough review of the amended proffers. With so much passage of time, the Board no longer had to decide on the propriety of allowing late waivers despite lack of cooperation with the Planning Commission. Then, considering the application in full, with the amended proffers, the Board voted in February 2006 to remand the application to the Planning Commission with the specific instruction that there be no time limit to the Planning Commission's review. When the Board considered the application at its May 2006 meeting, it had the benefit of the report of a fully briefed Planning Commission which had recommended approval.

24

Sowers decided to take the matter directly to the Board of Supervisors rather than continue to work with the Planning Commission.   I had never seen that done before." (Pl.'s Mot. Ex. 1 ¶ 5.)

Indeed, there is nothing in the record that suggests that any other applicant had eschewed a proffered opportunity to continue to process an application through the Planning Commission, and, instead, to insist that the application be considered by the Board.   Certainly, none of the comparator applicants discussed in the previous section pressed for such expedited consideration by the Board before full consideration by the Planning Commission had been completed.

On this record, it was necessary for Sowers to demonstrate specifically how his situation was similar to that of his proffered comparators.  He simply did not discharge that burden.

4.    Rational Basis

a.    The Unique Distinguishing Factors of Sowers' Application Presented Rational Bases for the Decisions of the Board

The relevant question under rational-basis review is whether local officials reasonably could have believed that their action was rationally related to a legitimate governmental interest.   Tri-County, 281 F.3d at 439 (internal citations and quotations omitted).   The record provides significant support for the Board's contention that its action in denying Sowers'

rezoning application was rationally related to legitimate governmental interests.  Sowers has not met his burden to negate all of those possible rational bases.

The record demonstrates that there were several legitimate issues of concern to government presented by the application filed by Sowers.  As recounted, there was substantial and organized citizen protest.  Citizens expressed concerns about traffic congestion, traffic safety, increased urbanization, and the consequent adverse impact on quality of life in the County. Not all of the bases for citizen opposition were the same as the traffic concerns expressed by VDOT (which appear to have been satisfied by Sowers' belated proffers on that point).  Also, preservation of the community's quality of life and concern for maintaining the rural character of the community are legitimate bases for governmental zoning decisions.  See Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978).

Furthermore, even if it were not reasonable for the County to draw fine lines between the specific traffic, safety, or urbanization concerns involved in the development proposed by Sowers compared to the developments proposed by others, it is undisputed that none of the other similar applications required Holland (or any other supervisor) to recuse himself.  It was reasonable for the Board to pay attention to the concerns of the voters in Holland's district because the disenfranchisement

occasioned by Holland's participation was not only a pure question of electoral representation, it was wrapped up in the controversy about the nature and extent of community growth and the differing views respecting whether, and how, to maintain the rural character of the county. As many citizens pointed out, Holland ran for election on a limited growth platform. Those topics, without doubt, lie in the province of a local governing board when it is making zoning decisions. See Penn Cent. Transp. Co., supra; Sylvia, 48 F.3d at 828-29 ("Indeed, it is the very essence of elected zoning officials' responsibilities to mediate between developers, residents, commercial interests, and those who oppose and support growth and development in the community.").

Given the disenfranchisement concerns expressed by citizens, it was reasonable for the Board not to accept the untimely proffers made by Sowers. And, that is particularly so because Holland, who had been elected on a limited growth platform, and in whose district the development lay, was the supervisor whose constituents were disenfranchised.

Likewise, considering that Sowers had declined the Planning Commission's offer to defer its consideration of the application and had insisted, instead, on having the application heard by the Board at its November meeting, it was reasonable for the Board to act on the application rather than to accede to Sowers'

belated request (made when it appeared that denial was likely) to return the matter to the Planning Commission or to defer the case to another day when it became obvious that there was strong and meritorious citizen opposition to the proposed rezoning.

There is visceral appeal to the argument that no other identified applicant has been denied the opportunity to have the Board consider his late proffers, or has been refused a deferral of Board consideration, or has been denied a remand to the Planning Commission, thereby illustrating disparity of treatment.  However, as discussed above, disparate treatment -- even if the disparity is great -- is not enough in itself to sustain an equal protection claim.  In this case, the same reasons upon which the Board reasonably might have relied to deny Sowers' application also could have been the basis for its decision to refuse acceptance of the late proffers, or to refuse the request for deferral or remand.  For instance, the heightened degree of citizen opposition to the development could be a sufficient reason to support those decisions.  Even comparing cases with comparable amounts of citizen opposition, the unique circumstances presented by Holland's relationship to the proposed development also could provide further reasonable support for those decisions.  The Board reasonably could conclude that it was particularly important not to create the perception that it would be influenced by factors as to which

neither the citizenry nor the Planning Commission had been afforded opportunity for input. And, indeed, during the public hearing, citizens lauded the Board's decision not to allow the late proffers. The same rationale applies with equal force to refusing the requests for deferral of Board consideration and remand to the Planning Commission. That is even more so because Sowers insisted on terminating the process before the Planning Commission and insisted on prompt consideration by the Board.

> **b. The Alleged Failure of Sowers to Work with the Planning Commission Would Also Be a Rational Basis for the Decisions of the Board**

This case potentially poses a different question than the typical equal protection claim for which there is limited evidence on the record as to the Board's rationale for the action it took. In most cases, the Court must rely on hypothetical, reasonable rationales presented by the record based on what a local official "reasonably could have believed." That is because, in most cases, there is no other basis for determining why the governmental body acted. Legislative history, when it exists, is created out of hearings and discussion from which there is not necessarily a clear indicator of the basis for the decision. Here, in contrast, Supervisor Cosby made a statement on the record that:

> Well, it's been to the Planning Commission once with refusal of the applicant to work with them, so they

> recommended a denial to us, and my motion
> is that it be denied at this level.

(Def.'s Mot. Ex. 1, Tab G at 46.)   The minutes of the meeting

reflect that the Board voted on that motion[6] and, thereupon,

rejected the rezoning application.

If the stated reason could not be a legitimate basis for

the Board's decision, it would be troublesome to decide the

issue by relying on hypothetical, unstated rationales, even if

they might find some support in the record.   See Weinberger v.

Wiesenfeld, 420 U.S. 646, 648 n.16 (1975).   (A court "need not.

. . accept at face value assertions of legislative purposes,

when an examination of the legislative scheme and its history

demonstrates that the asserted purpose could not have been a

goal of the legislation.").   Indeed, for that reason the Court

called for supplemental briefs respecting how to proceed where

there is a stated reason for decision that does not coincide

with the hypothetical reasons offered in argument.   Neither the

parties nor the Court uncovered precise instruction from the

decisional law.   However, based on the context of Cosby's

statement, the prior discussion at the hearing, and the votes of

the other Board members, the Court might well be able to

conclude that the statement on the record triggering the vote

---

[6]   The minutes state:   "Mr. Cosby moved to deny 04-11-REZ-C as
the applicant refused to work with staff and the Planning
Commission."   (Def.'s Mot. at Ex.1, Tab F at 13.)

did not foreclose the possibility that other rationales motivated the decisions of the other Board members, and still rely on the discussion from the previous section respecting the reasonableness facet of the equal protection analytical calculus.   Fortunately, it is not necessary to go down that path because, in this case, the rationale of Cosby's statement and the motion provides an acceptable rational basis for the Board's decision.

Sowers' position is that his purported failure to work with the Planning Commission could not be the actual reason for the Board's decision because: (1) if that were the true reason, the Board would have granted remand rather than denied his application; and (2) the Planning Commission only raised two issues - VDOT concerns and the amount of Sowers' cash proffer - of which the first was resolved by his amended proffers and the second was illegal under state law.[7]   (Transcript of Mot. for Summ. J. (Docket No. 56) 41-42.)   Relying on the above and Weinberg, Sowers argues that only the rationale set forth in the minutes can be considered in deciding the reasonableness facet of the equal protection claim.

---

[7] At the hearing, counsel stated that he had three responses to the Court's question of why the Board could not deny Sowers' application for his failure to work with the Planning Commission, but made only the two points listed here.

Sowers' position is bolstered by the fact that counsel for the County conceded at oral argument that the VDOT concerns and the failure to raise cash proffer were the only ways that Sowers failed to work with the Planning Commission.   (Transcript of Mot. for Summ. J. (Docket No. 56) 83-84.)   In supplemental briefing, however, counsel retracted that statement, arguing instead that "the record clearly shows that Sowers' refusal to continue working with the Planning Commission involved matters other than transportation and cash proffers."   (Supp. Mem. in Support of Mot. for Summ. J. 5.)

The admissions of counsel can be binding on the client and those admissions can be used to decide an issue.   However, the record here actually reflects the several ways in which Sowers failed to work with the Planning Commission, and it is preferable to resolve the issue on the record, rather than by reliance on a retracted admission of counsel.   From the documentary record, it is clear that Sowers failed to work with the Planning Commission on issues other than the transportation issues raised by VDOT and the amount of the cash proffers.   The Supplementary Report from the October 5, 2004 Planning Commission Meeting details,

> The Applicant has failed to proffer a Conceptual Plan or individual proffers to specifically address several rezoning criteria recommended by the Comprehensive Plan.   The Applicant has also failed to

32

> address the traffic impact and safety
> concerns outlined in VDOT's August 26, 2004
> letter, and elaborated in VDOT's September
> 30, 2004 letter. Because of these issues,
> Staff has no choice but to recommend denial
> of the request as it is currently proposed.

(Def.'s Mot. Ex. 1, Tab A at 9.) The first item mentioned was the failure of Sowers to address several rezoning criteria recommended by the County's Comprehensive Plan. Also, it is not clear from the record that the amended proffers (which were rejected as untimely) would have fully addressed the VDOT concerns, given that the Planning Commission and planning staff were not afforded an opportunity to review them before the Board meeting.

In addition, the refusal of Sowers to work with the Planning Commission can better be understood as a matter of approach than an inability to agree on specific proffers. As Mr. Stidham testified,[8] and as even the Amended Complaint sets forth, Sowers was unusual in fighting the Planning Commission on many of its recommendations, insisting, *inter alia*, that the Planning Commission could not make the recommendations of VDOT binding upon him. Even citizens perceived Sowers as difficult. Commenting on two of the amended proffers, Eugene Veler stated,

---

[8] Not only did Sowers insist on moving his application past the consideration of the Planning Commission, "he was very insistent upon debating a lot of different elements of the project that other applicants would typically take at face value and go on and provide." (Def.'s Mot. Ex. G. at 122.)

33

"[T]hey got some weasel words in it. Anything after the word if, that's a weasel word then. If. Why doesn't he just proffer all of the VDOT recommendations?" (Def.'s Mot. Ex. 1, Tab G at 26.)[9] It was also a departure from normal practice for Sowers to ask that the application be elevated directly to the Board rather than further to work with the Planning Commission to resolve their concerns. Although it is true that the Planning Commission could have decided to defer Sowers' application without his request, Sowers had made his wishes clear, and it is understandable that the Planning Commission would see little point in holding onto the application further when Sowers had demonstrated his desire for the Planning Commission to end its role in the process and proceed to present the application to the Board without resolving the Planning Commission's concerns.

It appears to have been unusual, perhaps unprecedented, for the Board to refuse untimely proffers, to refuse to defer a hearing on an application, and to refuse to remand to the Planning Commission, but Sowers presented the Board with an unusual, perhaps unprecedented, circumstance by short-circuiting the operations of the Planning Commission, insisting that the Board act, notwithstanding that the Planning Commission had

---

[9] Of course, the mere fact that an applicant is disagreeable or cantankerous would not be a rational basis for denying an application.

indicated that Sowers needed to continue the process at that level,[10] and by-passing the Planning Commission with the untimely proffers.

In denying the application, for the reason outlined in Cosby's motion (viewed in light of the record as a whole), it does not appear that the Board was announcing a new policy or treating Sowers differently than others similarly situated. Rather, the Board appears to have been considering a situation presented singularly by Sowers' own actions and using the term "working with the Planning Commission" as a reasonable proxy for whether the application was suitably responsive to the legitimate concerns attendant to rezoning as made manifest by both the Planning Commission and the citizens.

Sowers argues that had his lack of cooperation been the true reason for the Board's denial of his application, the Board would instead have remanded the application to the Planning Commission or deferred it to force him to work with the Planning Commission. According to Sowers, the true reason the Board denied the application was to coerce a higher proffer amount from him. Notwithstanding an ample opportunity for discovery, Sowers has not presented evidence from which a reasonable jury could reach that conclusion. To do so, a jury would have to

---

[10] Sowers does not contend that the Planning Commission was stalling or in any way acting improperly in attempting to perform its function.

stack inference upon inference, and that, of course, is impermissible.

Thus, Sowers' contention reduces to the proposition that the Board should have either referred the application to the Planning Commission or deferred consideration of it to a subsequent meeting of the Board because other applications had been accorded one of those treatments. That, says Sowers, shows the lack of a rational basis for the Board's decision to vote on, and reject, the rezoning application.

That argument fails because "[t]he 'rational' aspect of rational basis review refers to a constitutionally minimal level of rationality; it is not an invitation to scrutinize either the instrumental rationality of the chosen means (i.e., whether the classification is the best one suited to accomplish the desired result), or the normative rationality of the chosen governmental purpose (i.e., whether the public policy sought to be achieved is preferable to other possible public ends)." Van Der Linde, 507 F.3d at 295. Thus, while it might have been viable or preferable for the Board to have remanded the case to give the Planning Commission time to work with the application, or to defer the case to give itself more time to review the amended proffers and assess whether they met the concerns expressed by the Planning Commission, that is not a decision for this Court to make. And, in any event, Sowers has not shown that, on this

record, the Board's decision lacked a rational basis. Based on the record, the stated reasons of the Board are not so dubious as to invoke Weinberger.

Without doubt, it would have been preferable for the Board to have articulated more fully why it was of the view that Sowers had not adequately worked with the Planning Commission and why it did not consider remand or deferral to have been the appropriate course. But, the record here reflects that, in fact, Sowers had not been cooperative with the Planning Commission and, in fact, had virtually by-passed it with the belatedly tendered amended proffers, thereby depriving the Board of the Planning Commission's views on a very hotly, and widely, disputed rezoning application. The Board rationally could have concluded that deferral was not appropriate under that circumstance, particularly in view of the strong opposition voiced at the meeting. And, the Board rationally could have concluded that remand to the Planning Commission was inappropriate because Sowers recently had declined to work with that group, insisting, instead, that the rezoning application be considered by the Board.

Considering the record as a whole and according Sowers the benefit of all permissible inferences, the Court finds that Sowers has not carried his burden of demonstrating the existence of a genuine dispute of material fact as to which a reasonable

jury could find in his favor on the equal protection claims presented in Count One.

## C.    Counts Two and Three: Substantive Due Process

Counts Two and Three assert deprivations of substantive due process under the Fifth Amendment to the United States Constitution. To prevail on those claims, Sowers must show that he: (a) had property or a property interest; (b) that the state deprived him of that property or property interest; and (c) that the state's action fell so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency. Sylvia, 48 F.3d at 827. Substantive due process protections cover only "state action which is so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." Id.

### 1.    Count Two: Time Value of Application Fee

In Count Two, Sowers alleges that he was deprived of his property interest in the time value of his application fee. The first step in analyzing a due process claim is to determine whether or not the claimant has a cognizable property interest. Biser v. Town of Bel Air, 991 F.2d 100, 103 (4th Cir. 1993). "A property interest requires more than a unilateral expectation that a permit or license will be issued; instead there must be a

legitimate claim of entitlement...if a local agency has any significant discretion in determining whether a permit should issue, then a claimant has no legitimate entitlement and hence, no cognizable property interest." <u>Id.</u> at 104 (finding that plaintiff had no property interest in special exception before it was granted by the Board).

Sowers has supplied no decisional authority to support a finding that the time value of the fee could be a property interest. (Pl.'s Opp. Mot. Summ. J. at 12-13.) Nor has the Court found such authority.

In any event, for the reasons set forth above, the decision to deny the rezoning application had a rational basis. That alone is enough to vitiate any claim that the decision was beyond the bounds of any legitimate claim of government interest. Indeed, even without reference to the underlying concerns about congestion or urban development, the Board's decision would be legitimate, for purposes of a substantive due process analysis, solely as a response to the large amount of citizen opposition. <u>See</u> <u>Sylvia</u>, 48 F.3d at 828 ("Even if Sylvia Development and Dohnal are correct that appeasing the public was the only purpose behind the Board's action, in the context of this case we still cannot say that the Board's action bore no rational relationship to the exercise of the state's traditional zoning power.").

For the foregoing reasons, the County is entitled to summary judgment on Count Two.

## 2. Count Three: Ministerial Approvals

In Count Three, Sowers alleges a substantive due process claim under the Fifth Amendment to the United States Constitution because certain members of the County's staff did not issue certain permits required by state law, the issuance of which, according to Sowers, were ministerial acts under state law. This claim fails for several reasons.

First, the essential violation alleged in Count Three is a violation of state law. Those allegations, indeed, permeate Count Three. It is settled that a claim prosecuted by way of § 1983 is not viable unless it presents an alleged violation of the federal constitution or a federal law. It is true that the Amended Complaint talismanically invokes the Fifth Amendment to the federal constitution. But, the facts demonstrated on the post-discovery record show that Count Three is grounded exclusively in asserted violations of state law. It, therefore, is legally insufficient under § 1983 for that reason alone.

Second, the Amended Complaint makes clear that, in Sowers' view, issuance of the permits at issue were ministerial acts, performances of which could be enforced in the state court by a petition for a writ of mandamus. (Am. Compl. ¶ 164.) Powhatan County agrees. (Def.'s Mot. at 27.) Given this clear state

remedy, Sowers cannot meet the third facet of a substantive due process violation. Hence, even if Count Three were grounded in federal constitutional or statutory violations, it would fail.

In _Front Royal and Warren County Industrial Park Corporation v. Town of Front Royal_, the Fourth Circuit determined that the plaintiff could not satisfy the third element of a substantive due process claim where mandamus could rectify the Town's refusal to construct sewer lines. See 135 F.3d 275, 288 (4th Cir. 1998) ("The [Due Process] Clause is violated only where state courts can do nothing to rectify the injury that the state has already arbitrarily inflicted."); see also _Sylvia_, 48 F.3d at 829 ("Moreover, the fact that established state procedures were available to address and correct illegal actions by the Board belies the existence of a substantive due process claim.").

Sowers' grievances would more properly be pursued in state court. See _id._ ("But governmental actions that are violative of state law are properly challenged in state courts which exist, in part, to protect citizens from abuses of state law.). Although Sowers did not have occasion to seek mandamus so that his situation is not entirely analogous to the one in _Front Royal_, his receipt of approvals before filing a mandamus action serves only to demonstrate that there was no deprivation of his property interest.

## CONCLUSION

Based on the record, it is fair to say that Sowers was treated differently from other applicants for rezoning. It also is fair to say that the articulation of reasons by the Board of Supervisors was less than exemplary. However, the only issue to be decided in a federal court is whether there has been a violation of the federal constitution or a federal statute. After an opportunity for full discovery, Sowers has not carried his burden of showing that there exists a genuine dispute of material fact on any of his claims. On the record here presented, no reasonable jury could decide any of the three counts in the Amended Complaint in favor of Sowers. For the foregoing reasons, the defendants' Motion For Summary Judgment (Docket No. 36) will be granted and the defendants' Motion To Dismiss Amended Complaint Pursuant to Rule 12(b)(6) (Docket No. 23) will be denied as moot.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

_____
Senior United States District Judge

Richmond, Virginia
Date: March 12, 2008

42